### DUTY OF MOTORMEN AT STREET CROSSINGS.

Circuit Court of Cuyahoga County.

ANGELA M. HARRIS V. THE CLEVELAND ELECTRIC RAILWAY COMPANY.

Decided, February 5, 1912.

*Street Railway Crossing—Rights of Public—Motorman's Duty—Runaway Horse.*

1. A street car company has only equal rights with the driver of a horse, or a pedestrian, at a street crossing, and therefore it is the duty of the motorman as he approaches a street crossing, to have his car under control and to keep a constant lookout, not only ahead, but also to the right and left, so as to discover persons upon the track or approaching it without noticing or heeding the approaching car, so that he may allow 'them to pass over in safety.

2. A motorman can excuse himself for not seeing a person in danger at·a crossing when in the exercise of proper care he ought to have seen him, only by showing that at the moment, his attention was attracted by some other matter in the line of his duty.

2. Although plaintiff's horse was running away and she could not control it, yet if the motorman saw her and could have slowed up sufficiently to let her pass, it was his duty to do so, and if he failed in this duty, that failure was the proximate cause of the accident.

*A. Lawrence* and *H. F. Payer*, for plaintiff in error.
*Squire, Sanders & Dempsey*, contra.

WINCH, J.; MARVIN, J., and NIMAN, J., concur.

This was a personal injury damage case, verdict for the defendant being diercted at the close of plaintiff's evidence.

The accident happened at the junction of Riverside avenue with Detroit avenue, in the city of Lakewood, toward the close of the afternoon of the 12th day of October, 1906. The plaintiff was driving northerly on Riverside avenue, when her horse became unmanageable and ran away with her. As she approached Detroit avenue she saw a car of the defendant company approaching from the east at a high rate of speed and realized that she was apt to be struck by it, unless it slackened its speed. She held tightly onto the lines and managed to turn her horse toward the west at the corner and had got about fifteen or twenty feet from the corner when the car struck both the horse and buggy on their right side and she was thrown out and seriously injured.

There was evidence tending to show that there was a view across the corner from a point on Detroit avenue 250 feet east of Riverside avenue to a point on Riverside avenue 150 feet south of Detroit avenue, unobstructed except by a small office building directly at the corner.

The plaintiff testified:

"I could see the Detroit avenue car approaching, and I screamed to warn the motorman that I could not help myself, I first saw the Detroit avenue car when I was about one hundred and fifty feet from the corner. The car was about two hundred and fifty feet away, if not more. There was nothing by which my view was obstructed. I looked at the motorman in charge of the car, and he was looking at me. I could see across the corner there. He was facing towards me. I tried to hold my horse and I could not, so I tried to warn the motorman of my condition so that he would give me time to pass. I tried to stop the horse and when I could not, of course, the only place for me to turn was west. I turned the corner just as sharp as I could, say about fifteen or twenty feet, when the car struck me."

Two passengers on he car testified that at a point 200 feet before the car reached Riverside avenue they saw the horse running away and unmanageable, when it was at a point 150 feet south of Detroit avenue. One of them rang the bell when the car was 100 feet from Riverside avenue, but the motorman did

not slacken the speed of the car, which was running at a rate of from twenty-five to thirty miles an hour.

There was no evidence introduced to show within what distance a car running at that rate of speed might be stopped.

The plaintiff claimed that the accident was due to the excessive rate of speed at which the car was running, the neglect of the motorman to have it under control as he approached the crossing and his negligence in not noticing her danger in time to save her.

It is said that the trial judge took the case from the jury because he thought the running away of the horse and not the high rate of speed and negligence of the motorman, was the proximate cause of the injury.

It is well settled law, in this state at least, that a street car company has only equal rights with the driver of a horse, or a pedestrian, at a street crossing, and therefore it is the duty of the motorman as he approaches a street crossing, to have his car under control and to keep a constant lookout, not only ahead, but also to the right and left so as to discover persons upon the track or approaching it without noticing or heeding the approaching car, so that he may allow them to pass over in safety.

Thus, it was held in the case of *The Toledo Street Railway Company* v. *Westenhuber*, 22 C. C., 67, that:

"It is negligence in the motorman of an electric street car, when the car is from 150 to 200 feet from a street crossing and he sees a wagon about to cross the track, not to try to stop or slacken the speed of the car until almost at the crossing when, by so doing, the collision which ensued might have been avoided."

This case was affirmed by the Supreme Court without report in 65 O. S., 567.

In the same case it was said:

"If the driver could go upon and move more than half over the crossing before the arrival of the car, when the car was going at full speed, obviously the car might have been controlled by the motorman, so that the driver could have passed entirely over without a collision."

So here, though there was no evidence as to the distance within which a car going at the rate of twenty-five to thirty miles an

hour could be *stopped,* yet, as the horse got fifteen to twenty feet to the west of the crossing before the car struck the front wheel of the buggy, *obviously* the collision would not have occurred if the motorman had slowed up his speed the least appreciable amount. It took no expert testimony to advise the jury of this fact. Any person of ordinary intelligence can figure it out.

While there was evidence introduced by the plaintiff showing that the motorman *actually saw* her and her danger in plenty of time to avert the collision, for she says she saw him looking at her, still it would be sufficient if her evidence merely tended to prove that, in the exercise of care commensurate to the occasion, *he ought* to have seen her, and the evidence of the two passengers, as well as her own tends to prove that.

The rule, as understood and several times applied by this court, is that the motorman can excuse himself for not seeing the person in danger at a crossing when, in the exercise of proper care he ought to have seen him, only by showing that at the moment, his attention was attracted (by some other matter in the line of his duty.

It would seem, therefore, that the plaintiff introduced evidence tending to show negligence on the part of the motorman. Was that negligence the proximate cause of the accident?

Although the plaintiff's horse was running away, and she could not control it, the collision was not inevitable if the motorman saw her and could have slowed up sufficiently to let her pass. It was then his duty to slow up, and if he failed in this duty, that failure of duty would be the proximate cause of the accident.

The same is true though he did not see her, if, under the circumstances, in the performance of his duty to keep a lookout, he failed to see what he ought to have seen.

So, too, his negligence is not less, but greater, if his car was running at an excessive rate of speed and was not under control.

As tending to show that a speed of from twenty-five to thirty miles an hour is excessive speed at this place, the ordinance of the city of Lakewood, limiting the speed of such cars to eighteen miles an hour, was introduced. This was some evidence to be

considered in determining the defendant's liability. "It served to give character to the act causing the injury." *Meek* v. *Pennsylvania Co.,* 38 O. S., 638.

There was sufficient evidence in this case to go to the jury and put the defendant upon its defense.

For error in directing a verdict for the defendant, the judgment is reversed and the cause remanded for further proceedings.